## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 22-CR-155 (TSC) |
| | : | |
| ANTONIO CHRISTIAN PAYNE, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing.  For the reasons herein, the United States requests that the Court sentence Defendant Antonio Payne (hereinafter, "the defendant") to a period of 272 months' incarceration, followed by a period of 60 months of supervised released.  The government is also seeking forfeiture of all firearms, ammunition, and U.S. currency seized from the defendant's base of operations at 2430 Baldwin Cres. NE, Washington, D.C., as specified in the Forfeiture Allegation in the Superseding Indictment.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On September 8, 2023, a federal grand jury sitting in the District of Columbia returned a 10-count superseding indictment against the defendant, charging him with Unlawful Possession with Intent to Distribute Four Hundred Grams or More of Fentanyl, in violation of 18 USC §§ 841(a)(1) and (b)(1)(A)(vi) (Count One); Unlawful Possession with Intent to Distribute 50 Grams or More of Methamphetamine, in violation of 21 USC §§ 841(a)(1) and (b)(1)(A)(viii) (Count Two); Unlawful Possession with Intent to Distribute Marijuana, in violation of 21 USC §§ 841(a)(1) and (b)(1)(D) (Count Three); Unlawful Possession with Intent to Distribute Cocaine Hydrochloride, in violation of 21 USC §§ 841(a)(1) and (b)(1)(C) (Count Four); Unlawful

Possession with Intent to Distribute Cocaine Base, in violation of 21 USC §§ 841(a)(1) and (b)(1)(C) (Count Five); Unlawful Possession with Intent to Distribute Oxycodone, in violation of 21 USC §§ 841(a)(1) and 841(b)(1)(C) (Count Six); Unlawful Opening and Maintenance of Premises to Manufacture and Distribute a Controlled Substance, in violation of 21 USC § 856(a)(1) (Count Seven); Using, Carrying, and Possessing a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 USC § 924(c)(1)(A)(i) (Count Eight); Using, Carrying, Possessing and Brandishing a Firearm During and in Relation to a Drug Trafficking Offense, in violation of 18 USC § 924(c)(1)(A)(ii) (Count Nine); and Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 DC § 4504(a) (Count Ten).  On December 6, 2023, a jury trial on all ten counts commenced before this Court, which ultimately concluded on December 18, 2023, with the jury returning a verdict of guilty on all 10 counts and finding for the government with respect to the special findings requested on Counts One and Two.

In sum, as the Court already is well aware by virtue of having presided over extensive pre-trial litigation and a week-long trial, the defendant's convictions stem, at least initially, from an armed confrontation he initiated outside his residence and stash house on April 18, 2022, in which, in the middle of a public street, he brandished a firearm at an individual whom he perceived to be staking out his residence and the valuable contraband inside.  This armed confrontation, in turn, led to the individual coming back minutes later and, in broad daylight in a residential neighborhood, firing multiple rounds at the defendant's stash house as well as the defendant's cousin who happened to be outside.  That drive-by shooting in turn led to law enforcement officers responding to the area, entering the defendant's stash house by consent, investigating the circumstances surrounding the shooting and recovering surveillance video showing that the defendant had brandished a firearm and brought it into the residence mere minutes before officers

arrived.  Ultimately, law enforcement applied for and obtained a search warrant for the residence in their efforts to find the single handgun they believed to be present.  Instead, they uncovered what was, in essence, the base of operations for the defendant's lucrative drug trafficking operation, which entailed a multitude of controlled substances, chief among them fentanyl, protected by a small arsenal of assault rifles, handguns, ammunition, firearms accessories, and a bullet proof vest.  Additional warrants executed on the defendant's digital devices further fleshed out the true breadth and longevity of the defendant's drug and firearms trafficking business.

## II. DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

### A.   Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  See *United States v. Gall*, 128 S. Ct. 586, 596 (2007).  The listed factors in 18 U.S.C. § 3553(a) include the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>
> > (i) issued by the Sentencing Commission ...; and
> >
> > (ii) that, . . . are in effect on the date the defendant is sentenced; ...
>
> (5) any pertinent policy statement –
>
> > (A) issued by the Sentencing Commission ... and
> >
> > (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

B.   <u>Guidelines Calculations</u>

Turning to 3553(a)(4)(A), the government largely concurs with the assessment of the United States Probation Office for the District of Columbia (hereinafter, "U.S. Probation") regarding the total offense level applicable in this case, the defendant's criminal history score and the resulting range under the U.S. Sentencing Guidelines (hereinafter, "Guidelines" or "USSG"), but disagrees with respect to U.S. Probation's determination that the two § 924(c) charges must run consecutively to one another.

1.   *Total Offense Level*

First, the government agrees that Counts 1 through 6 group pursuant to USSG § 3D1.2(d), because the offense level for each count is determined largely on the basis of the total amount of harm or loss, the quantity of substance involved, or some other measure of aggregate harm. Count 7, in which the defendant was charged with and convicted of with Maintaining a Drug-Involved Premises, would also group with Counts 1 through 6 because this count "embodies conduct that is

treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the count," under § 3D1.2(c).  The combined offense level for the group is then determined by looking at the offense level for the most serious of the counts comprising the group, which in this case is § 2D1.1, under § 3D1.3(a).  The government agrees with U.S. Probation's application of the § 2D1.1 to the facts of this case and its determination of the total converted drug weight for all contraband recovered from the home – 5,544.209 kilograms – putting his base offense level at 32.  *See* PSR at ¶¶ 16, 34.  The government further agrees that two points should be added to the base offense level under § 2D1.1(b)(12) because the defendant was maintaining a drug-involved premises. – increasing the base offense level to 34.  There are no applicable adjustments in this case under Chapter Three of the Guidelines and the defendant is not entitled to a reduction in his offense level under the newly enacted provision for "Zero-Point Offenders" under § 4C1.1.  Thus, the offense level applicable to the first group – Counts 1 through 7 – is 34.

The government agrees that for Counts 8 and 9, the relevant Guideline provision is § 2K2.4(b), which provides that if the defendant was convicted of violating section 924(c), the guideline sentence is the minimum term of imprisonment required by statute.  *See* PSR at ¶ 32.  For the reasons explained below, however, the government does not agree that in fashioning the Defendant's sentence, the Court must run each of these counts of conviction consecutive to one another.

Finally, the government agrees that under the relevant provisions of the D.C. Voluntary Sentencing Guidelines ("VSG"), Carrying a Pistol Without a License (Outside Home or Place of Business) is classified as a Group 8 offense.  *Id.* at 45.

2.    *Criminal History*

The government agrees that the defendant's criminal history score is 1, placing him in

Criminal History Category I.

| Arrest Date | Charge / Court | Disposition Date / Sentence | Scoring (USSG; VSG) |
|---|---|---|---|
| 09/06/2011 | Trespassing; Arlington County Circuit Court | 3/12/13, $250 Fine; $201 court costs | 0; ¼ |
| 07/02/2013) | Failure to Pay ESTBD Fare/Prince George's County District Court, Hyattsville, MD (5E00537241) | 10/29/2013: Pled guilty; unsupervised probation before judgment; $50 fine (suspended) | 0; 0 |
| 07/30/2014 | No Permit; D.C. Superior Court | 10/1/2014, 10 days ESS all, followed by 60 days of unsupervised probation | 0; 0 |
| 07/09/2016 | Attempted Operating After Suspension, D.C. Superior Court, | 6/23/2017, 20 days ESS all following by 9 months of unsupervised probation | 0; ¼ |
| 10/28/2019 | Possession of a Controlled Substance (Oxycodone), D.C. Superior Court | 3/5/2020, 180 days ESS all followed by 6 months of supervised probation | 1; 1 |
| | | | **1; 1 ½** |

With one criminal history point, the defendant is in Criminal History Category I under the USSG.  Under the D.C. Voluntary Sentencing Guidelines, the Defendant has 1 ½ criminal history points, placing him in D.C. Criminal History Category B.

> 3.    *Guideline Range*

With respect to Group 1, Counts One through 7, at a Total Offense Level of 34, in Criminal History Category I, the defendant's Guideline range is 151-188 months' incarceration.  For Counts Eight and Nine, the Guideline range is 60 months' and 84 months' incarceration, respectively. Finally, with respect to Count 10, pursuant to the D.C. VSG, the defendant's range is 10-28 months, with incarceration, long-split, short-split, and probationary sentences all being available.

C.    <u>Sentencing Recommendation</u>

The government recommends that the Court sentence the defendant to a total of 272 months' incarceration given the nature and seriousness of his offense; his history and characteristics; and the need for the sentence imposed to satisfy the statutory requirements set forth in § 3553(a)(2)(A)-(D).

> 1.    *Nature and Seriousness of the Offense*

Defendant's conduct on April 18, 2022 (and in the years preceding it) sits precisely at the lethal intersection of two twin crises currently plaguing the District – gun violence and the opioid epidemic – and warrants significant punishment.  Defendant was a larger-scale narcotics trafficker who was moving significant quantities of deadly drugs, including fentanyl, both in the form of powder and counterfeit oxycodone pills.  To protect his enterprise, he maintained a cache of firearms, firearms accessories, and ammunition at his mother's home in a residential neighborhood in Northeast D.C. full of young families and their children.  When his enterprise came under threat on April 18, 2022, he resorted to brandishing a firearm in broad daylight against a would-be

intruder, threatening to kill the individual if he were to see him again, and setting off a drive-by shooting in the neighborhood in the middle of the day.  Far from being an outlier in the defendant's life, April 18, 2022 was the natural, logical culmination of the defendant's chosen career path – drug-fueled gun violence, which fortunately, did not result in death or serious bodily injury.

To understand how serious the defendants' various crimes are, it is necessary to put them into context.  Beginning with just his possession with intent to distribute fentanyl, the defendant had nearly 700 grams of fentanyl at that residence, which, given the sheer quantity, packaging, and additional indicia of distribution, was almost certainly a wholesale amount, to be diluted with cutting agents and sold on to lower-level re-distributors to increase the defendant's profit margin. Yet just under 2 milligrams of fentanyl can be lethal.  *See* https://www.dea.gov/resources/facts-about-fentanyl.  Indeed, because of individuals like the defendant flooding the city with large quantities of this dangerous synthetic opioid, D.C. remains at the very center of the nation's opioid epidemic.  According to the Center for Disease Control, D.C. ranked number one in the nation for drug overdose deaths, based on the age-adjusted rate of deaths per 100,000 persons, in 2021.  For opioid overdose deaths specifically in 2021, D.C. ranks number two in the nation, trailing just behind West Virginia by 7%.  *See*   https://www.wusa9.com/article/news/local/dc-health-advocates-urge-mayor-to-declare-opioid-crisis-a-public-health-emergency/65-8cad9abd-af25-4013-bcb1-51e8e67dfa84 ; https://www.cdc.gov/drugoverdose/fatal/dashboard/index.html.  The situation has fared little better since 2021.  From October 2022 to October 2023, drug overdose deaths increased an estimated 10.37% compared to the national decrease of 2.3%.  *See* https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.  Furthermore, according to the Office of the Chief Medical Examiner for the District, in 2023, there was 518 opioid-related fatal overdoses in DC with an average of 43 deaths per month.  The mortality rate was 68.6 deaths per

100,000.  This is up from 461 overdoses in 2022, 427 in 2021, and 411 in 2020.  This is also a jump from the 38 deaths per months in 2022.[1]  In the final analysis, the defendant did not simply have 700 grams of fentanyl, he had hundreds of thousands potentially lethal doses waiting to be delivered to customers.

Moreover, what makes the defendant's trafficking operations particularly pernicious is that a portion of the fentanyl he was caught with was contained in counterfeit oxycodone pills with the blue "M30" logo imprinted on them.[2]  Given the potential for such pills containing potentially lethal amounts of fentanyl to be marketed and represented as actual medications, and given the pills' linkages to overdose deaths throughout the United States, the U.S. Sentencing Commission has amended the Guidelines to add a 2-level enhancement at §2D1.1(b)(13) for cases where the defendant sold fake pills containing fentanyl after falsely represented they were legitimate medication.  *See* Amendment # 818, "Fake Pills Amendment," Amendments to the Sentencing Guidelines, April 27, 2023.  While the amendment has no impact on the defendant's own Guidelines' calculation, it underscores the severity of the conduct at issue and the efforts of the Sentencing Commission to capture the unique harms posed by what the defendant had been doing. This behavior demands a sentence at the top of the Guideline range.

And of course, the defendant did not simply possess fentanyl in large quantities.  He he had a cornucopia of different controlled substances, including more than a 125 grams of pure crystal meth; cocaine powder; cocaine base; hundreds of illegal oxycodone pills; and kilograms of

---

[1]

https://ocme.dc.gov/sites/default/files/dc/sites/ocme/agency_content/Opioid%20related%20Overdoses%20Deaths_Mar2024.pdf

[2]  Of course, the defendant also had significant quantities of actual oxycodone pills in the stash house at 2430 Baldwin Cres NE.

marijuana.  The variety of narcotics the defendant had that day and the quantities in which he had them demonstrate how significant of a trafficker he was up until his arrest.

Beyond the large quantities of potentially lethal drugs the defendant had and intended to sell, the defendant's conduct is all the more egregious because of the steps he undertook to protect them.  Indeed, this case provides an almost canonical example of why firearms possessed and used in furtherance of drug trafficking pose such a threat to public safety and merit severe punishment. The defendant brandished a firearm against an apparent rival who was scoping out the defendant's garage – where multiple kilograms of marijuana were later found – and threatened to kill him, setting off a drive-by shooting in a densely-populated neighborhood.  Yet, as the government's evidence at trial demonstrated, the possibility of armed intruders accessing his stash house was something for which the defendant had been preparing, and rather diligently at that.  The defendant had six separate firearms at the residence – four handguns and two rifles, one of which was privately manufactured.[3]



Trial Ex. 325



Trial Ex. 330

---

[3] The U.S. Sentencing Commission has recognized the unique threat posed by privately manufactured firearms ("PMFs") and amended § 2K2.1 to include a four-level enhancement to the base offense level if the firearm involved was a ghost gun.  In doing so, the Commission concluded that there was no basis to distinguish a ghost gun from a gun with an obliterated serial number (for which there is currently a four-level enhancement), noting that the concerns with lack of traceability (and thus ensuing attractiveness to criminals intent on using them) that apply to firearms with obliterated serial numbers also apply to PMFs.  See U.S. Sentencing Commission, Amendments to the Sentencing Guideline, April 27, 2003, pp. 60-61.



Trial Ex. 341



Trial Ex. 347



Trial Ex. 415



Trial Ex. 423



Trial Ex. 436



Trial Ex. 397

In addition, to these firearms, he had hundreds of rounds of ammunition, a stabilizing accessory to make a handgun fire more like a rifle, and a bullet proof vest which could stop rifle rounds.  As the events of April 18, 2022, demonstrated, the defendant did not possess these weapons and accessories to show off to potential rivals; he possessed them because he anticipated he would one day he would have to use them, just as he did on April 18, 2022.  The small armory he had at his house was not incidental to his large-scale narcotics trafficking, it was essential to it: the larger the quantities of controlled substances he kept at that residence, the more risk he faced of his tens of thousands worth of narcotics being stolen, and the greater the incentive to protect it at all costs.

The defendant's conduct, of course, did not occur in a vacuum.  The District has, in recent years, been plagued by a surge in violent crime, going from 3,850 crimes to 5,336 crimes from 2022 to 2023—a 39% increase – and 203 to 274 homicides in that same time period.  *See* https://mpdc.dc.gov/page/district-crime-data-glance.  Large-scale narcotics trafficking enterprises that require constant protection have likely contributed to these horrifyingly high numbers.  *See* National Institute for Criminal Justice Reform, "Gun Violence Problem Analysis Summary Report: Washington, D.C., https://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/release_content/attachments/DC%20Gun%20Violence%20Problem%20Analysis%20Summary%20Report.pdf (finding that drug-related disputes accounted for approximately 10 percent of all homicide circumstances from January 2019-December 2020).

In sum, the defendant's conduct that day, and his trafficking business more generally, demonstrated a significant, ongoing threat to public safety, both with respect to the immense

amounts of deadly fentanyl he intended to distribute as well as the arsenal of weapons he used and planned to use to protect his product.

    2. *History and Characteristics*

  The Defendant, admittedly, has relatively little criminal history, though the fact that he has accumulated only four convictions does not necessarily weigh in his favor.  The defendant's engaging in firearms and narcotics trafficking was not a one-time foray in April 2022, but rather part of a well-established pattern of conduct.  While the focus of the government's case at trial was, necessarily, on the circumstances surrounding the defendant's brandishing of the firearm and the officers' ensuing search of his stash house, the defendant's trafficking business was established well before April 18, 2022, and was the product of a long-term, strategic, deliberate series of choices made by the defendant.  Indeed, as the Court is aware through pre-trial evidentiary rulings, the government had a series of text messages and digital media stretching back a number of years, which demonstrate that the defendant had long been engaged in the business of buying and selling firearms and narcotics.  That he had only been caught in April 2022 and had not accumulated a series of convictions related to his drug business reflects luck, not necessarily innocence, and is thus of little moment.  The fact remains that his livelihood for a not insignificant portion of his adult life was drug trafficking.

    3. *Need for the Sentence Imposed*

  In light of the foregoing, the government is recommending a sentence of a total 272 months' incarceration, broken down as follows:

| Count of Conviction | Recommended Sentence | Applicable Mandatory Minimum | Consecutive / Concurrent |
|---|---|---|---|
| 1 | 188 months | 120 months | Concurrent with Counts 1-7 |
| 2 | 188 months | 120 months | Concurrent with Counts 1-7 |

| 3 | 60 months | N/A | Concurrent with Counts 1-7 |
|---|---|---|---|
| 4 | 188 months | N/A | Concurrent with Counts 1-7 |
| 5 | 188 months | N/A | Concurrent with Counts 1-7 |
| 6 | 188 months | N/A | Concurrent with Counts 1-7 |
| 7 | 188 months | N/A | Concurrent with Counts 1-7 |
| 8 | 60 months | 60 months | Concurrent with Counts 9, 10; consecutive to Counts 1-7[4] |
| 9 | 84 months | 84 months | Concurrent with Counts 8, 10; consecutive to Counts 1-7 |
| 10 | 28 months | N/A | Concurrent with Counts 8, 9, |

The government believes that such a sentence will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and allow the defendant with training, treatment, and other type of care he may require.

Given that the government is recommending that the Court impose the mandatory minimum and Guideline range for the § 924(c) counts, the thrust of the argument over the defendant's sentence and the application of the 3553(a) factors will likely come down to the sentence imposed for Counts 1-7, where the Guidelines afford a larger range of 151-188 months and the Court retains the ability to vary downward significantly to 120 months if it so chooses.

The government believes that only a sentence at the top of the Guidelines for Counts 1-7 – 188 months – plus an additional 84 months' incarceration for the 924(c) convictions – will best effectuate purposes of sentencing set forth in 3553(a). First, the defendant was knowingly

---

[4] The government does not believe that the two § 924(c) convictions may be run consecutive to one another. The convictions both stemmed from the same underlying predicate offenses – Counts 1 through 7. In *United States v. Anderson*, 59 F.3d 1323 (D.C. Cir. 1995), the D.C. Circuit found that multiple convictions for using or carrying firearm 'during and in relation to' drug trafficking crime may not be linked to single underlying predicate offense. As such, the Court should run both 924(c) convictions concurrently with one another, resulting in a total of 84 months' incarceration to run consecutive to the sentences the defendant receives on the other counts.

trafficking in large quantities of a lethal drug, fentanyl, which is currently fueling an epidemic in the District as discussed above.  In addition, he was also in the business of selling counterfeit pills laced with deadly fentanyl, which could have easily been eventually re-distributed to unwitting consumers.  Simply because the Commission's recent amendment to the Guidelines does not retroactively apply to the defendant's conduct does not mean that the Court is barred from considering it.  *United States v. Taylor*, 648 F.3d 417, 425 (6th Cir. 2011)  (holding that the district court can consider subsequent amendments to the Guidelines for purposes of fashioning an appropriate sentence under the § 3553(a) and citing cases).  On the contrary, the defendant's embrace of trafficking in a particularly lethal drug and illicit pills weighs in favor of a sentence at the top of the Guidelines range.  Moreover, while the defendant is of course being punished for his possession and use of firearms in furtherance of his drug trafficking enterprise, even the consecutive 84 months' incarceration does not necessarily capture the severity of his conduct.  It is not as though the firearm the defendant brandished at the intruder on the day in question was the only weapon the defendant had.  That black handgun was just one of *six* the defendant possessed. A review of the sundry ammunition, firearms accessories, and body armor recovered from the defendant's stash house demonstrates that he was preparing for and anticipating armed conflict in a way that the mere conviction for brandishing one firearm only begins to hint at.  The Guidelines do not take into account the fact that he had six guns, as opposed to one, or the presence of body armor or firearms accessories making it easier to hunt down potential targets, or the hundreds of rounds of ammunition present.  All of these factors further justify a sentence at the top of the range.

Furthermore, considerations of deterrence, both of the defendant specifically and the public at large, also weigh in favor of a sentence at the top of his Guidelines.  The defendant engaged in armed narcotics trafficking for years – what the Court and jury saw occur on April 18, 2022, was

15

simply the culmination of the defendant's years' long, intentional effort to amass large quantities of narcotics and firearms.  Such conduct, involving, as it did, a series of deliberate decisions made over a prolonged period of time, is exactly the type of criminal behavior that may be most susceptible to deterrence.  The sentence imposed on the defendant must communicate a message to the defendant and others contemplating engaging in his chosen profession that the costs of trafficking in deadly, illicit substances while armed and perpetrating violence in support of that are incredibly high and entail potentially decades in federal prison.

Finally, with respect to the potential sentencing disparities, the government acknowledges U.S. Probation's finding that for individuals' defendants whose primary guideline was §2D1.1 and fentanyl was the primary drug type, with a Final Offense Level of 34 and a Criminal History Category of I, the average sentence length was 161 months' incarceration.  *See* PSR at ¶ 167. Nevertheless, the government's recommendation would not create *unwarranted* disparities given that there are a number of aggravating factors that weigh in favor of a higher than average sentence for a fentanyl trafficker– including the presence of counterfeit oxycodone pills; the sheer variety of different narcotics; the number of illegal firearms, accessories, ammunition, and body armor at the stash house; the presence of a rifle that was a privately manufactured firearm; the establishment of a stash house in a densely packed residential neighborhood; and the defendant's initiation of an armed, drug-related conflict in that neighborhood.

## III.    CONCLUSION

WHEREFORE, the government requests that the Court impose a total sentence of 272 months' incarceration, followed by 60 months' of supervised release, and order the forfeiture of all currency, firearms, and ammunition identified in the Superseding Indictment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

*/s/ Will Hart*
WILL HART
D.C Bar No. 1029325
SOLOMON EPPEL
D.C. Bar No. 1046323
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202)-252-7877 (Hart)
(202)-252-6661 (Eppel)
William.hart@usdoj.gov
Solomon.Eppel@usdoj.gov

17